COBB, Chief Justice.
 

 The dispositive issue on this appeal is whether the order appealed from was a final judgment. We hold that it was not, and we remand the case.
 

 Facts
 

 On June 23, 2000, Iola Williams filed a medical-malpractice action against Colie E. Crutcher, Jr., M.D., and the City of York Healthcare Authority d/b/a Hill Hospital (“Hill Hospital”). Williams’s action arose out of her visit to the Hill Hospital emergency room in June 1998, during which she was treatéd by Dr. Crutcher. Williams alleged against Dr. Crutcher claims of medical negligence and the tort of outrage and against Hill Hospital claims of medical negligence, the tort of outrage, negligence, and negligent hiring and supervision of Dr. Crutcher and other Hill Hospital staff.
 

 On July 26, 2004, Hill Hospital filed the following cross-claim, seeking indemnity from Dr. Crutcher in the event it was found liable:
 

 “In the event Hill Hospital is found liable predicated upon the acts and/or omissions of [Dr.] Crutcher, while allegedly acting as its agent, Hill Hospital is entitled to common law indemnity for [Dr.] Crutcher’s acts and/or omissions.”
 

 On September 26, 2005, the case went to trial. At the close of her case, Williams voluntarily agreed to dismiss her tort-of-outrage claim and her negligent-training- and-supervision claim to the extent it alleged negligent training and supervision of a hospital employee named Thelma Love. Before submitting the case to the jury, the trial court dismissed all Williams’s claims “except negligence.” The trial court instructed the jury on Williams’s medical-negligence claims against Dr. Crutcher and Hill Hospital. The trial court then gave the following instruction with regard to Hill Hospital’s indemnification cross-claim:
 

 “Last point I want to make, you heard Mr. Chestnut [Williams’s attorney] talking about a cross-claim where Hill Hospital filed a suit against Dr. Crutcher. That is in the case, but you don’t need to worry about it at this point. We’ll deal with that depending on your verdict. That is in the lawsuit but you don’t need to worry about it at this time.”
 

 The jury returned a verdict for Williams against both Dr. Crutcher and Hill Hospital in the amount of $145,000. After the jury returned its verdict, the trial court submitted written questions to the jury to determine whether the jury found that Dr. Crutcher was acting as an agent of Hill Hospital at the time he treated Williams and, if so, whether the jury’s award against Hill Hospital was based solely on the actions of Dr. Crutcher in his capacity as an agent of Hill Hospital. In response to the written questions, the jury stated that it found that Dr. Crutcher was acting as an agent, servant, or employee of Hill Hospital. The jury further stated that its verdict against Hill Hospital was “[d]ue to Hill Hospital’s own acts of negligence com
 
 *635
 
 bined with acts of negligence of Dr. Crutcher.”
 

 On October 24, 2005, the trial court entered an order stating that “judgment is rendered” in favor of Williams on her claims against Dr. Crutcher and Hill Hospital in the amount of $145,000.
 
 [1]
 
 The trial court’s order did not address Hill Hospital’s indemnity cross-claim against Dr. Crutcher. Neither did it direct the entry of a final judgment as to Williams’s claims against Dr. Crutcher and Hill Hospital in accordance with the provision in Rule 54(b), Ala. R. Civ. P., for certifying as final a judgment disposing of fewer than all claims in an action.
 

 The trial court denied the postjudgment motions filed by Dr. Crutcher and Hill Hospital. On March 7, 2006, Dr. Crutcher filed a notice of appeal to this Court. On March 21, 2006, Hill Hospital filed a notice of appeal to this Court. Subsequently, Williams and Hill Hospital filed a joint motion to dismiss Hill Hospital’s appeal on the ground that they had reached a settlement. This Court granted the motion and dismissed Hill Hospital’s appeal on July 11, 2006.
 

 Standard of Review
 

 This Court is not limited by the parties’ jurisdictional arguments; we are obligated to look beyond those arguments and to dismiss an appeal
 
 ex mero motu
 
 if, for any reason, jurisdiction does
 
 not
 
 exist.
 
 Reynolds v. Colonial Bank,
 
 874 So.2d 497, 508 (Ala.2003) (“ ‘[I]f there is an absence of jurisdiction over the subject-matter, this ends the inquiry; it cannot be waived or supplied by consent.’ ” (quoting
 
 Wilkinson v. Henry,
 
 221 Ala. 254, 256, 128 So. 362, 364 (1930) (emphasis added)));
 
 Ex parte Smith,
 
 438 So.2d 766, 768 (Ala.1983) (“Lack of subject matter jurisdiction may not be waived by the parties and it is the duty of an appellate court to consider lack of subject matter jurisdiction
 
 ex mero motu.”
 
 (citing
 
 City of Huntsville v. Miller,
 
 271 Ala. 687, 688, 127 So.2d 606, 608 (1958)));
 
 Payne v. Department of Indus. Relations,
 
 423 So.2d 231 (Ala.Civ.App.1982); and
 
 Bibb v. Boyd,
 
 417 So.2d 206, 208 (Ala.Civ.App.1982) (“[I]n any event, lack of jurisdiction over the subject matter is not waivable and may be raised ex mero motu by either a trial court or by an appellate court.” (citing 5 Wright and Miller,
 
 Federal Practice and Procedure,
 
 Civil § 1393)). A court is obligated to vigilantly protect against deciding cases over which it has no jurisdiction because “[i]t would amount to usurpation and oppression for a court to interfere in a matter over which it has no jurisdiction, and its pronouncements in respect thereto would be without force, and its decrees and judgments would be wholly void. This is a universal principle, as old as the law itself.”
 
 Wilkinson,
 
 221 Ala. at 256, 128 So. at 364.
 

 However, when the parties have not provided sufficient legal or factual justification for this Court’s jurisdiction, this Court is
 
 not
 
 obligated to embark on its own expedition beyond the parties’ arguments in pursuit of a reason to exercise jurisdiction. The burden of establishing the existence of subject-matter jurisdiction falls on the party invoking that jurisdiction.
 
 See, e.g., Ex parte HealthSouth Corp.,
 
 974 So.2d 288 (Ala.2007) (setting
 
 *636
 
 forth the plaintiffs burden of demonstrating standing to bring an action, an issue of subject-matter jurisdiction);
 
 Ex parte Haynes Downard Andra & Jones, LLP,
 
 924 So.2d 687, 691 (Ala.2005) (stating that the party seeking a writ of mandamus bears the burden of showing that the party has properly invoked the court’s jurisdiction);
 
 Ex parte Ray-El, 911
 
 So.2d
 
 1100,
 
 1104 (Ala.Crim.App.2004) (placing the burden to “ ‘justify the jurisdiction of this court’ ” on the person bringing a habeas petition as a “next friend” (quoting
 
 Whitmore v. Arkansas,
 
 495 U.S. 149, 164, 110 S.Ct. 1717, 109 L.Ed.2d
 
 135 (1990))); cf. Bush v. Laggo Props., L.L.C.,
 
 784 So.2d 1063, 1065 (Ala.Civ.App.2000) (“Once a party challenges the trial court’s jurisdiction, pursuant to Rule 12(b)(1), [Ala. R. Civ. P.,] the burden of establishing jurisdiction is on the plaintiff.” (citing
 
 Menchaca v. Chrysler Credit Corp.,
 
 613 F.2d 507 (5th Cir.1980))).
 

 “ ‘The question whether an order appealed from is final is jurisdictional ....’”
 
 Hinson v. Hinson,
 
 745 So.2d 280, 281 (Ala.Civ.App.1999) (quoting
 
 Powell v. Powell,
 
 718 So.2d 80, 82 (Ala.Civ.App.1998)). “It is a well established rule that, with limited exceptions, an appeal will lie only from a final judgment which determines the issues before the court and ascertains and declares the rights of the parties involved.”
 
 Taylor v. Taylor,
 
 398 So.2d 267, 269 (Ala.1981). In the absence of subject-matter jurisdiction, this Court has no power to consider the merits of an appeal.
 
 See Ex parte V.S.,
 
 918 So.2d 908, 912 (Ala.2005) (quoting
 
 Flannigan v. Jordan,
 
 871 So.2d 767, 768 (Ala.2003)).
 

 Analysis
 

 Dr. Crutcher recognizes that the judgment against him may not be a final judgment and, if it is not, that this Court should, therefore, remand the action to the Sumter Circuit Court for a determination as to whether that court chooses to certify the order as final pursuant to Rule 54(b), Ala. R. Civ. P., and then accept the appeal as filed.
 
 [2]
 

 Williams, however, argues that the judgment in her favor is final. According to Williams, the parties stipulated at trial that Hill Hospital’s cross-claim against Dr. Crutcher would survive only if the jury found Hill Hospital liable solely on the basis of Dr. Crutcher’s negligence. Thus, Williams contends, the cross-claim is now moot because the jury did not find Hill Hospital liable solely on the basis of Dr. Crutcher’s negligence; it found liability based on “Hill Hospital’s own acts of negligence.” Williams concludes that the judgment is final because “there [is] no further issue to be decided and no other verdict on which to render judgment by the Court.” Williams’s brief, p. 18.
 

 Williams’s failure to comply with Rule 28, Ala. R.App. P., precludes consideration of her argument that the order on appeal is a final judgment.
 
 [3]
 
 Rule 28 requires the parties to reference “the appro
 
 *637
 
 priate page numbers of the record on appeal.” Rule 28(g). Williams’s citation to the record does not direct this Court to the stipulation she describes. The record, in the context of Williams’s arguments, does not contain such a stipulation. This Court will not consider evidence or stipulations that are outside the record.
 
 Etherton v. City of Homewood,
 
 700 So.2d 1374, 1378 (Ala.1997).
 

 Further, Williams cites no legal authority to support her theory that a claim terminates upon the happening of an event that causes the claim to be moot, rather than upon the entry of an order disposing of the claim. Without a record of the facts on which Williams’s argument rests, and in the absence of any citation to legal authority, this Court has no practical means of considering Williams’s argument.
 
 Butler v. Town of Argo,
 
 871 So.2d 1, 20 (Ala.2003) (“ ‘[I]t is not the function of this Court to do a party’s legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.’ ” (quoting
 
 Dykes v. Lane Trucking, Inc.,
 
 652 So.2d 248, 251 (Ala.1994)));
 
 cf. Stover v. Alabama Farm Bureau Ins. Co.,
 
 467 So.2d 251, 253 (Ala.1985) (“While we attempt to avoid dismissing appeals or affirming judgments on what may be seen as technicalities, we are sometimes unable to address the merits of an appellant’s claim when the appellant fails to articulate that claim and presents no authorities in support of that claim.”).
 

 The trial court’s order is not a final judgment. Because the order does not address Hill Hospital’s cross-claim against Dr. Crutcher, it “adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties.”
 
 See
 
 Rule 54(b), Ala. R. Civ. P. Such an order is still subject to revision and is not final where, as here,' the trial court has not directed the entry of a final judgment according to the requirements of Rule 54(b).
 
 See Kelley v. U.S.A. Oil Corp.,
 
 363 So.2d 758, 760 (Ala.1978) (“Because such an order is subject to revision, it is not a final judgment.”);
 
 see also First Alabama Bank of Montgomery, N.A. v. Martin,
 
 381 So.2d 32, 33 (Ala.1980) (defining a final judgment as “an order or decree which puts an end to all matters litigated or which ought to have been litigated with respect to a particular controversy”).
 

 As an alternative to her argument that the trial court’s judgment is final, Williams asks this Court to remand the case for the trial court to amend or correct the judgment under Rule 60(a), Ala. R. Civ. P., to include a dismissal of the cross-claim. Her argument fails for lack of support. Williams cites no authority in support of her proposition that Rule 60(a) is the appropriate vehicle for resolving the jurisdictional defect in the appeal.
 

 Moreover, Rule 60(a) “deals solely with the correction of clerical errors,” not with “errors of a more substantial nature.” Rule 60, Ala. R. Civ. P., Committee Comments on 1973 Adoption. “Clerical errors” are errors “ ‘to which the judicial sanction and discretion cannot be said reasonably to have been applied.’ ”
 
 Lester v. Commisky,
 
 459 So.2d 868, 870 (Ala.1984) (quoting
 
 Ex parte ACK Radio Supply Co. of Georgia,
 
 283 Ala. 630, 635, 219 So.2d 880, 885 (1969)). In this case, determining how to adjudicate the cross-claim in light of the law, the jury’s answers to interrogatories, and any stipulation by the parties requires judicial discretion. The record contains no indication that the trial court exercised that discretion. A Rule 60(a) motion “cannot be used to make [the judgment] say something other than what was originally pronounced.” Ala. R. Civ. P. 60, Committee Comments on 1973 Adoption. Therefore, in this case, Rule 60(a) does not
 
 *638
 
 permit a remand with instructions to “correct” the judgment under Rule 60(a) by dismissing the cross-claim.
 

 This appeal is appropriately handled under the remand process outlined in
 
 Foster v. Greer & Sons, Inc.,
 
 446 So.2d 605, 609-10 (Ala.1984),
 
 overruled on other grounds, Ex parte Andrews,
 
 520 So.2d 507, 510 (Ala.1987):
 

 “When it appears from the record that the appeal was taken from an order which was not final, but which could have been made final by a Rule 54(b) certification, we will remand the case to the trial court for a determination as to whether it chooses to certify the order as final, pursuant to Rule 54(b), and, if it so chooses, to enter such an order .... ”
 

 Therefore, this case is remanded for the trial court either (1) to make the October 24, 2005, order a final judgment pursuant to Rule 54(b), Ala. R. Civ. P.; or (2) to adjudicate Hill Hospital’s cross-claim against Dr. Crutcher. Failure to respond to the remand with fourteen (14) days will result in the dismissal of the appeal as being from a nonfinal judgment.
 

 REMANDED.
 

 SEE, SMITH, and PARKER, JJ., concur.
 

 WOODALL, J., concurs in the result.
 

 On Return to Remand
 

 COBB, Chief Justice.
 

 On March 14, 2008, we remanded this case with instructions for the trial court to make its judgment final pursuant to Rule 54(b), Ala. R. Civ. P., or to adjudicate a cross-claim that remained pending against Colie E. Crutcher, Jr., M.D.
 
 Crutcher v. Williams,
 
 12 So.3d 681 (Ala.2008)
 
 (“Crutcher I”).
 
 In response, the trial court entered an order; however, that order contravened our opinion and instructions. We again remand the case for the trial court to enter another order in accordance with the opinion and instructions in
 
 Crutcher I.
 

 Facts
 

 We described the procedural history of this case in
 
 Crutcher I.
 
 In pertinent part, those facts are as follows:
 

 “On June 23, 2000, Ida Williams filed a medical-malpractice action against Co-lie E. Crutcher, Jr., M.D., and the City of York Healthcare Authority d/b/a Hill Hospital (‘Hill Hospital’). Williams’s action arose out of her visit to the Hill Hospital emergency room in June 1998, during which she was treated by Dr. Crutcher. Williams alleged against Dr. Crutcher claims of medical negligence and the tort of outrage and against Hill Hospital claims of medical negligence, the tort of outrage, negligence, and negligent hiring and supervision of Dr. Crutcher and other Hill Hospital staff.
 

 “On July 26, 2004, Hill Hospital filed the following cross-claim, seeking indemnity from Dr. Crutcher in the event it was found liable:
 

 “
 
 ‘In
 
 the event Hill Hospital is found liable predicated upon the acts and/or omissions of [Dr.] Crutcher, while allegedly acting as its agent, Hill Hospital is entitled to common law indemnity for [Dr.] Crutcher’s acts and/or omissions.’ ”
 

 12 So.3d at 634.
 

 This court summarized the posttrial proceedings as follows:
 

 “On October 24, 2005, [following a jury trial,] the trial court entered an order stating that ‘judgment is rendered’ in favor of Williams on her claims against Dr. Crutcher and Hill Hospital in the amount of $145,000. The trial court’s order did not address Hill Hospital’s indemnity cross-claim against Dr. Crutcher. Neither did it direct the en
 
 *639
 
 try of a final judgment as to Williams’s claims against Dr. Crutcher and Hill Hospital in accordance with the provision in Rule 54(b), Ala. R. Civ. P., for certifying as final a judgment disposing of fewer than all claims in an action.
 

 “The trial court denied the post-judgment motions filed by Dr. Crutcher and Hill Hospital. On March 7, 2006, Dr. Crutcher filed a notice of appeal to this Court.”
 

 12 So.3d at 635.
 

 This Court in
 
 Crutcher I
 
 found that the judgment from which Dr. Crutcher appealed was not a final judgment because it did not dispose of the cross-claim filed by the City of York Healthcare Authority d/b/a/ Hill Hospital (“Hill Hospital”) against Dr. Crutcher and because the cross-claim had not been otherwise adjudicated. Accordingly, we remanded this case to the trial court with instructions to make its October 24, 2005, judgment final pursuant to Rule 54(b), Ala. R. Civ. P., or to adjudicate Hill Hospital’s cross-claim against Dr. Crutch-er.
 

 In
 
 Crutcher I,
 
 we specifically addressed and rejected Iola Williams’s argument that, on remand, the trial court could “amend” its October 24, 2005, order pursuant to Rule 60(a), Ala. R. Civ. P., to “correct” the judgment so as to adjudicate Hill Hospital’s cross-claim and thus make the October 24, 2005, judgment final. We stated:
 

 “As an alternative to her argument that the trial court’s judgment is final, Williams asks this Court to remand the case for the trial court to amend or correct the judgment under Rule 60(a), Ala. R. Civ. P., to include a dismissal of the cross-claim. ... Williams cites no authority for her proposition that Rule 60(a) is the appropriate vehicle for resolving the jurisdictional defect in the appeal.
 

 “Moreover, Rule 60(a) ‘deals solely with the correction of clerical errors,’ not with ‘errors of a more substantial nature.’ Rule 60, Ala. R. Civ. P., Committee Comments on 1973 Adoption. ‘Clerical errors’ are errors ‘ “to which the judicial sanction and discretion cannot be said reasonably to have been applied.” ’
 
 Lester v. Commisky,
 
 459 So.2d 868, 870 (Ala.1984) (quoting
 
 Ex parte ACK Radio Supply Co. of Georgia,
 
 283 Ala. 630, 635, 219 So.2d 880, 885 (1969)). In this case, determining how to adjudicate the cross-claim in light of the law, the jury’s answers to interrogatories, and any stipulation by the parties requires judicial discretion. The record contains no indication that the trial court exercised that discretion. A Rule 60(a) motion ‘cannot be used to make [the judgment] say something other than what was originally pronounced.’ Ala. R. Civ. P. 60, Committee Comments on 1973 Adoption. Therefore, in this case, Rule 60(a) does not permit a remand with instructions to ‘correct’ the judgment under Rule 60(a) by dismissing the cross-claim.”
 

 Crutcher I,
 
 12 So.3d at 637-38.
 

 On March 26, 2008, the trial court entered the following order, styled as an “Amended Judgment”:
 

 “Pursuant to the Jury Verdict of October 11, 2005, judgment is rendered in favor of the Plaintiff Iola Williams and against the Defendants Colie E. Crutch-er, Jr., M.D., and City of York Healthcare Authority/Hill Hospital in the amount of One Hundred Forty-Five Thousand Dollars ($145,000) for compensatory damages;
 

 “Further,
 
 for purposes of clarification in accordance with Rule 60(a) Ala. R. Civ. P. to correct the Court’s oversight:
 
 Judgment is rendered,
 
 nunc pro tunc,
 
 in favor of the Cross-Defendant Colie E.
 
 *640
 
 Crutcher, Jr., M.D., on the City of York Healthcare Authority/Hill Hospital’s Cross-Claim pursuant to the Jury Verdict of October 11, 2005, in which Jury Questions # 1 and # 2 were incorporated. This Court was of the opinion that the Jury’s Verdict and its answers to post-verdict Questions # 1 and # 2 disposed of Defendant Hill Hospital’s cross-claim against Defendant Crutcher as a matter of law and thus left nothing further to be adjudicated and no other verdict on which to render judgment. “Accordingly this Court previously entered Judgment on the Jury Verdict on October 24, 2005, intending the Judgment to be final as to all parties and so as to dispose of all claims in this matter. “This Amended Judgment reflects the Court’s original intention and corresponds with the Jury Verdict of October 11, 2005, into which Jury Questions # 1 and # 2 were merged. ...”
 

 (Emphasis added; footnote omitted.)
 

 Analysis
 

 “Tt is well established that on remand the issues decided by an appellate court become the “law of the case,” and that the trial court must comply with the appellate court’s mandate.’ ”
 
 Sonnier v. Talley,
 
 806 So.2d 381, 388-89 (Ala.2001) (quoting
 
 Gray v. Reynolds,
 
 553 So.2d 79, 81 (Ala.1989)).
 

 In
 
 Crutcher I,
 
 after directly and expressly considering the parties’ arguments on the issue, we explained that Rule 60(a), Ala. R. Civ. P., did not provide authority for the trial court, on remand, to “amend” its October 24, 2005, judgment to adjudicate Hill Hospital’s cross-claim against Dr. Crutcher. Nevertheless, the trial court entered an order on remand purporting to do exactly that. We now remand the case for the trial court to vacate its March 26, 2008 order and to enter an order in accordance with
 
 Catcher I
 
 and the instructions in
 
 Crutcher I
 
 that it either (1) make the October 24, 2005, order a final judgment pursuant to Rule 54(b), Ala. R. Civ. P.; or (2) adjudicate Hill Hospital’s cross-claim. Failure to respond within 28 days will result in the dismissal of the appeal as being from a nonfinal judgment.
 

 REMANDED WITH INSTRUCTIONS.
 

 SEE, WOODALL, SMITH, and PARKER, JJ., concur.
 

 On Return to Second-Remand
 

 COBB, Chief Justice.
 

 Colie E. Crutcher, Jr., M.D., appeals from the October 24, 2005, judgment of the Sumter Circuit Court in favor of Iola Williams on her medical-negligence claims against him.
 
 [1]
 
 We reverse the trial court’s judgment and render a judgment for Dr. Crutcher.
 

 This is the third time this Court has considered this case. We described the procedural history of this case in
 
 Crutcher v. Williams,
 
 12 So.3d 631 (Ala.2008)
 
 (“Crutcher
 
 I”). In pertinent part, those facts are as follows:
 

 “On June 23, 2000, Iola Williams filed a medical-malpractice action against Co-lie E. Crutcher, Jr., M.D., and the City of York Healthcare Authority d/b/a Hill Hospital (‘Hill Hospital’). Williams’s action arose out of her visit to the Hill Hospital emergency room in June 1998, during which she was treated by Dr.
 
 *641
 
 Crutcher. Williams alleged against Dr. Crutcher claims of medical negligence and the tort of outrage and against Hill Hospital claims of medical negligence, the tort of outrage, negligence, and negligent hiring and supervision of Dr. Crutcher and other Hill Hospital staff.
 

 [[Image here]]
 

 “On September 26, 2005, the case went to trial. ... Before submitting the case to the jury, the trial court dismissed all Williams’s claims ‘except negligence.’ The trial court instructed the jury on Williams’s medical-negligence claims against Dr. Crutcher and Hill Hospital. ...
 

 “The jury returned a verdict for Williams against both Dr. Crutcher and Hill Hospital in the amount of $145,000.
 

 [[Image here]]
 

 “On October 24, 2005, the trial court entered an order stating that ‘judgment is rendered’ in favor of Williams on her claims against Dr. Crutcher and Hill Hospital in the amount of $145,000.”
 

 12 So.3d at 634-35.
 

 On November 10, 2005, Dr. Crutcher filed a motion for judgment as a matter of law, arguing, among other things, that Williams presented no evidence that any actions of Dr. Crutcher caused her injuries. The trial court denied Dr. Crutcher’s postjudgment motion. On March 7, 2006, Dr. Crutcher filed a notice of appeal to this Court. However, “Dr. Crutcher’s appellant’s brief was not filed until August 9, 2007, due in large part to the failure of the circuit clerk to timely file the record on appeal.”
 
 Crutcher I,
 
 12 So.3d at 636 n. 2.
 

 On March 14, 2008, this Court concluded that the judgment from which Dr. Crutch-er appealed was not a final judgment because the trial court had not disposed of an indemnity cross-claim filed by the City of Yo^k Healthcare Authority d/b/a Hill Hospital (“Hill Hospital”) against Dr. Crutch-er.
 
 See Crutcher I.
 
 Accordingly, we remanded this case to the trial court with instructions to make its October 24, 2005, judgment final pursuant to Rule 54(b), Ala. R. Civ. P., or to adjudicate Hill Hospital’s cross-claim against Dr. Crutcher.
 
 Id.
 
 The trial court entered an order in response to our opinion; however, that order contravened our opinion and instructions. Therefore, on May 30, 2008, we again remanded the case for the trial court to enter another order in accordance with the opinion and instructions in
 
 Crutcher I. See Crutcher v. Williams,
 
 12 So.3d 631, 638 (Ala.2008)
 
 (“Crutcher II
 
 ”).
 

 On June 27, 2008, the trial court entered an order adjudicating the cross-claim in response to our instructions in
 
 Crutcher II.
 
 On October 20, 2008, the clerk of the Sumter Circuit Court certified the supplemental record on appeal as complete, and, on October 23, 2008, the record on appeal was supplemented with the trial court’s June 27, 2008, order. We now address the merits of the appeal.
 

 Standard of Review
 

 “When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion ....
 
 Palm Harbor Homes, Inc. v. Crawford,
 
 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution.
 
 Carter v. Henderson,
 
 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975;
 
 West v. Founders
 
 
 *642
 

 Life Assurance Co. of Fla.,
 
 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury.
 
 Carter,
 
 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw.
 
 Id.
 
 Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling.
 
 Ricwil, Inc. v. S.L. Pappas
 
 &
 
 Co.,
 
 599 So.2d 1126 (Ala.1992).”
 

 Waddell & Reed, Inc. v. United Investors Life Ins. Co.,
 
 875 So.2d 1143, 1152 (Ala.2003).
 

 Facts
 

 At the trial in this case, most of the relevant facts were in dispute. When the conflicting evidence is viewed in the light most favorable to Williams and all reasonable inferences from the evidence are drawn, as they must be, in her favor,
 
 Waddell & Reed, supra,
 
 the facts are follows:
 

 In June 1998, Williams, a resident of Livingston, Alabama, consulted her physician, Dr. Charles Quarles, regarding severe headaches from which she had been suffering. Following her visit to Dr. Quarles, Williams underwent an MRI brain scan around 3:00 p.m. on Friday, June 26, 1998, in Meridian, Mississippi, approximately 35 miles from her home in Livingston. Dr. James A. Kenney signed the MRI report. According to Dr. Ken-ney’s report, the MRI showed that Williams was suffering from hydrocephalus. Dr. Kenney also noted in his report that a portion of Williams’s brain, the cerebellar tonsils, extended 1.2 centimeters below her foramen magnum, an opening at the base of the skull through which the spinal cord enters the skull. In addition, Dr. Kenney’s MRI report included the following comment:
 

 “The patient’s primary physician, Dr. Quarles, was unavailable and the above results were given to Dr. Crutcher (the covering physician) ... at the time of interpretation of the examination. The patient’s significant other as well as a nurse friend were given the above findings and instructed to proceed to an emergency room in order [for Williams] to be evaluated.”
 

 Dr. Kenney contacted Williams at her home that same afternoon. After speaking with Dr. Kenney, Williams telephoned the emergency room of Hill Hospital to notify the hospital that she was on her way. Thelma Love, an emergency-room nurse at Hill Hospital, testified that she received this call shortly before 5:00 p.m. on Friday, June 26, 1998. After taking Williams’s call, Nurse Love telephoned Dr. Crutcher, the emergency-room physician,
 
 [2]
 
 and told him that ‘Tola Williams had a test done in Meridian, and she needs someone to take the report and transfer her to” the University of Alabama at Birmingham (“UAB”) hospital. At that time, Dr. Crutcher told Nurse Love to telephone him when Williams arrived at the hospital.
 

 Approximately 10 minutes after Nurse Love notified Dr. Crutcher that Williams was on the way, Williams arrived at the emergency room with her husband, James Cox. Williams testified that she asked Nurse Love for help and told her that her
 
 *643
 
 head hurt. Williams testified that, because of her pain, she was crying and “balled up” in a chair by the admissions desk. Upon Williams’s arrival at the emergency room, no admissions paperwork was completed and Williams’s vital signs were not taken.
 

 Shortly after Williams’s arrival, Nurse Love telephoned Dr. Crutcher to inform him that Williams had arrived. At that time, Dr. Crutcher was treating a patient at his family-practice office across the street from the hospital. He continued treating that patient.
 

 At some point while Williams and Cox were waiting for Dr. Crutcher to arrive at the hospital, Williams telephoned her friend, Alexis Brown, a nurse, and asked her to come to the hospital. When Brown arrived, Cox was speaking by telephone with Dr. Kenney, who had called the emergency room to speak to Cox. Cox handed the telephone receiver to Brown. Brown made the following note of the information she received from Dr. Kenney:
 

 “Iola Williams. Dr. Kenny [sic], Radiologist[.] Needs to see a neurologist[.] MRI brain 6/26/98, Hydrocephalus. Lat[eral] ventricles are enlarged. Transit ependimal [sic] edema around. UAB. Cerebella [sic] tonsils ... sticking down 1.2 cm.”
 

 Williams testified that she waited for Dr. Crutcher at the admissions desk “[m]aybe thirty to forty-five minutes, maybe longer. It might have been an hour.”
 

 When Dr. Crutcher arrived, Nurse Love showed him Brown’s note from her conversation with Dr. Kenney. Dr. Crutcher spoke with Williams, completed a mental assessment of her, and asked her what type problem she was having. He found Williams to be alert and anxious. Williams asked for pain medicine; Dr. Crutcher refused to give her pain medication.
 

 Williams gave the following testimony regarding her conversation with Dr. Crutcher at Hill Hospital:
 

 “Q: Tell us everything you said to Dr. Crutcher.
 

 “A: I told Dr. Crutcher my head was hurting so bad that I felt like it was going to bust open and that I need some help and that I had called saying my brain was swollen. At that time that’s all I know was that my brain was swollen.
 

 “Q: What was Dr. Crutcher’s response?
 

 “A: What you want me to do, what you want me to do. Your brain is swelling, the airway is shutting down. What you want me to do.
 

 “Q: Did you tell him what you wanted him to do?
 

 “A: Yes, I did.
 

 “Q: What did you tell him?
 

 “A: I told him I wanted him to treat me and transfer me to UAB [hospital].
 

 “Q: Why did you want him to transfer you to UAB [hospital]?
 

 “A: James [Cox] may have said Dr. Kenney. I don’t know. But there was some conversation about we needed to get to UAB [hospital].
 

 “Q: What was Dr. Crutcher’s response to the request for treatment and to be transferred to UAB [hospital]?
 

 “A: He didn’t do anything.”
 

 Eventually, Williams and Cox left the Hill Hospital emergency room. Taking with them Brown’s handwritten note from her conversation with Dr. Kenney, they returned to their automobile, and Cox drove them to UAB hospital. On the way, Williams’s pain became greater, she cried, and she began to have trouble breathing. Cox testified that, at one point during the journey, Williams began to make a gur
 
 *644
 
 gling noise “like her breath was not coming through.” Williams told Cox that she could not breathe. At that point, Cox pulled over into the emergency lane on the interstate and attempted to call emergency 911 on his mobile telephone, but he was unable to give the emergency operator a mile marker or an exit number by which the operator could pinpoint their location. Cox decided he could not take a chance on waiting for emergency responders to locate them, and he drove on. Williams testified that she feared for her life. When they arrived in Birmingham, Cox lost his way on the unfamiliar streets, but he eventually located UAB hospital and took Williams into the emergency room there.
 

 Dr. Eric Rudolph Ehrensing, an emergency-room doctor at UAB hospital, examined and treated Williams. Williams told him that she had suffered from headaches for about a week and a half and that she was also having vision problems, trouble with her balance, and bouts of confusion. She also told Dr. Ehrensing that after she had had an MRI earlier that day, Dr. Kenney told her that she needed to go to the local emergency room and that she had a cerebellar tonsilar herniation, which, according to Dr. Ehrensing, “would be a life-threatening condition.”
 

 Dr. Ehrensing had told Cox that he wanted Williams to undergo an MRI, but when Dr. Ehrensing realized that Williams had already had an MRI that day, Dr. Ehrensing scheduled a CT scan instead. Williams had the CT scan shortly after midnight. The results of the CT scan confirmed that Williams had hydrocephalus. The radiology report from the CT scan contained this note:
 

 “For further evaluation magnetic resonance imaging is recommended with contrast enhancement.”
 

 At 2:10 a.m. on Saturday, June 27, Dr. Ehrensing consulted with Dr. Mark Had-ley, a neurologist at UAB hospital, about Williams’s case and the results of the CT scan. The CT scan confirmed that Williams was suffering from hydrocephalus. The CT scan did not indicate cerebellar tonsilar herniation, which, according to Dr. Ehrensing, “would have been very easily seen and definitely described on this C.T. scan.” According to Dr. Ehrensing, the CT scan did not indicate a life-threatening condition, and Dr. Ehrensing saw no need to operate immediately. Dr. Ehrens-ing made an appointment for Williams to see Dr. Hadley on Monday, June 29, 1998.
 

 Dr. Ehrensing advised Williams that she could return to work and other normal activities. Williams was then discharged from UAB hospital early on Saturday, June 27.
 

 Williams received no pain medication and no oxygen while she was in the emergency room at UAB hospital. Dr. Ehrens-ing did not give Williams pain medication because, he ' testified, pain medication would have adversely affected his and other physicians’ ability to evaluate Williams’s neurological condition.
 

 In his deposition, which was admitted as testimony at the trial in this case, Dr. Ehrensing testified that his treatment of Williams at the emergency room of UAB hospital would have been no different had Dr. Crutcher done any, or all, of the following: completed an emergency-room-screening form for Williams, made a medical record of Williams’s visit, made a written record of Williams’s informed refusal to consent to treatment,
 
 [3]
 
 accepted
 
 *645
 
 Williams’s MRI report from Dr. Kenney, monitored Williams’s vital signs and breathing, administered oxygen to Williams, telephoned UAB hospital to inform the medical personnel that Williams was on her way or to give UAB hospital the results of Williams’s MRI report, or transferred Williams to the UAB hospital emergency room. Dr. Ehrensing testified that, had Dr. Crutcher administered pain medication to Williams, it could have adversely affected Dr. Ehrensing’s ability to evaluate Williams and that his treatment of Williams was not adversely affected by the fact that Dr. Crutcher had not given Williams pain medication. Dr. Ehrensing testified that the fact that Williams was not transferred to UAB hospital by ambulance did not affect his treatment of her, but, if she had been, “[i]t may have made her triage a little faster because ambulances tend to take priority.” Dr. Ehrens-ing further testified that, had personnel at Hill Hospital evaluated the degree to which pain was affecting Williams’s mental status, he would have made use of that information in treating her but that, in any event, he would have performed such an evaluation on his own.
 

 Dr. Ehrensing also testified as follows:
 

 “Q. Would the findings of the M.R.I. report have been important to you in assessing Miss Williams when she was in the emergency room that night?
 

 “A. Yeah, it would — yes. I mean, it would be important to have all the data. But at the same time, the only thing that I can see in front of me is the C.T. scan. So I didn’t — I didn’t have a report nor an M.R.I. to look at.
 

 “Q: And I believe the C.T. scan report says recommend an M.R.I.—
 

 “A. Correct.
 

 “Q. —correct?
 

 “A. (Nods head affirmatively.)
 

 “Q. So had you had the M.R.I., would that have helped you in assessing Miss Williams that night?
 

 “A. Uh-huh. Yes.”
 

 Williams spent the weekend at her home in Livingston, sleeping fitfully and waking at times with excruciating pain in her head. Sometimes when she awoke she did not know where she was; she continued to have bouts of difficulty breathing.
 

 On Monday, June 29, 1998, Cox took Williams to Meridian, Mississippi, to obtain Williams’s MRI films. He then took her to Birmingham for her appointment at UAB hospital with Dr. Hadley. Dr. Had-ley spoke with Williams and looked at the MRI films she had brought from Meridian, then sent Williams to the neuro-intensive-care unit, where the pressure on her brain was monitored for several hours.
 

 On Tuesday, June 30, 1998, Dr. Hadley performed surgery on Williams. He installed a ventricular shunt to decrease the pressure on her brain by draining the excess fluid that had accumulated in her skull.
 

 In Dr. Hadley’s deposition testimony, which was admitted as evidence at trial, Dr. Hadley gave the following testimony:
 

 “Q. Had [Dr. Ehrensing] had — had the UAB emergency room doctor had this report [the June 26, 1998, MRI report from Meridian] to give you this report if you were the neuro consult that he made early Saturday morning, would that have made a difference with respect to the treatment of Ms. Williams?
 

 [[Image here]]
 

 “A. I don’t know. I just don’t know what he would have thought. I don’t know — I didn’t know whether — I know we had her MR study when I
 
 *646
 
 saw her in my clinic on the 29th. Did she go home and get it and bring it back, I mean I don’t know.
 

 “Q. ... I will tell you that she brought the films to your office on Monday. ...
 

 “A. I didn’t have this [June 26, 1998, MRI result] apparently when I was consulted either by my resident or however it was [on Saturday, June 27, 1998,] and with only her clinical examination to base it on by our ER physician who reported her as awake and alert and conversant but with some complaints, I agreed to see her first thing Monday knowing that she had hydrocephalus. Now, did we have a CT scan? I’m sure we did. We must have had something or we wouldn’t have known she had hydrocephalus. “Now, had I — I do know that when I saw her MR I didn’t say come back and see me in a week. You know, we made the decision to admit her to the hospital. Would it have made a difference? It might have. I might have just admitted her on Saturday, pretty impressive, but I was not asked or was not shown the study to review.”
 

 Although Dr. Hadley did not recall his consultation -with Dr. Ehrensing, he testified that he would have had the following response to the information relayed by Dr. Ehrensing, which consisted solely of Dr. Ehrensing’s examination and the CT scan, without Williams’s MRI results:
 

 “I’m concerned about her. Does she need to be admitted? ... I would have asked [Dr. Ehrensing] some of these other issues about her vital signs which appear okay on [Dr. Ehrensing’s notes], and with that I would have said, you know, her troubles alone and the increased tone worry me. Why don’t you make — I don’t know that she needs to be admitted. ... I would have said if she’s not ill and throwing up and having mental status, then tell her I’m worried enough about her I want to see her Monday morning. That’s what happened.
 

 “Now, other counsel asked me if I had seen the MR study what would I have done. I’d [have] admitted her because that’s exactly what I did when I saw her MR study, so with the information I have given to me third hand by, you know, an emergency room physician ... I’m worried enough about her to see her the next possible clinical day, like Monday, but that’s all the information I had. “Why did I worry? Because these patients can deteriorate rapidly. Did she? No. So we either got lucky or we treated her in a timely fashion.”
 

 At the trial of this case, Dr. Eldred Mattatha Brunson, testifying as Williams’s medical expert, opined that the medical care Dr. Crutcher provided Williams when she sought emergency medical treatment at Hill Hospital on June 26, 1998, was not consistent with the standard of care ordinarily exercised in the national medical community by emergency-room physicians. According to Dr. Brunson, Dr. Crutcher breached the standard of care by making “little or no effort to care for Ms. Williams in a potentially life-threatening situation”; by failing to complete a medical-screening form or an emergency-room record of Williams’s visit; by failing to explain to Williams that her situation was life-threatening; by failing to attempt to transfer Williams to UAB hospital in an emergency medical vehicle; by failing to make arrangements to make Williams comfortable in the meantime; and by failing to stabilize her condition. Dr. Brunson also testified that the standard of care for a physician treating Williams in the Hill Hospital emergency room would have required the
 
 *647
 
 physician to consider Williams’s headache an emergency and to ensure that Williams received treatment as quickly as possible.
 

 Dr. Brunson gave the following opinion as to whether any act or omission on the part of Dr. Crutcher caused Williams any harm:
 

 “Q: Can you attach — Well to a medical degree of certainty the fact that Ms. Williams was left in the condition she was in on the day in question at Hill Hospital and then had to be transported by private vehicle with her husband to UAB and the time spent going there or waiting in the hospital, can you say with any degree of medical certainty this had an impact on her medical condition?
 

 [[Image here]]
 

 “A: Yes.”
 

 When asked about what harm Williams might have sustained because Dr. Crutch-er or Hill Hospital breached the standard of care, Dr. Brunson responded simply that the injury to Williams was a “delay in treatment” that could have had a “potential” for damaging Williams’s brain. Dr. Brunson further testified that this delay in treatment prolonged Williams’s suffering from pain, headaches, difficulty breathing, and other symptoms of hydrocephalus. Dr. Brunson testified that Dr. Crutcher’s failure to communicate to UAB hospital information about Williams’s condition and the MRI results caused a delay in her treatment once she reached UAB hospital; Dr. Brunson’s reason for this opinion was his understanding that Dr. Hadley testified by deposition that, had Dr. Hadley seen a copy of Williams’s MRI results when Dr. Ehrensing consulted him early Saturday morning, June 27,1998, Dr. Had-ley would have immediately admitted Williams to the neuro-intensive-eare unit. Dr. Brunson also testified that Dr. Crutch-er met the standard of care by not administering pain medication to Williams. It is undisputed that, if Williams had been transported to UAB hospital in an emergency vehicle, she would have been given no medication to ease her pain before she reached UAB hospital.
 

 At the trial in this case, Williams testified:
 

 “Q: Has what happened at Hill Hospital in June of 1998 caused you any emotional problems that still linger?
 

 [[Image here]]
 

 “A: Because of the terrible ordeal I went through, it’s something that will stay with me the rest of my life and something I will fear for the rest of my life, that I will get sick again and not be so lucky. The Lord blessed me, and I thank him. I am scared every day I have a serious medical problem.”
 

 Analysis
 

 This is a medical-malpractice action governed by the Alabama Medical Liability Act, § 6-5-480
 
 et seq.
 
 and § 6-5-541
 
 et seq.,
 
 Ala.Code 1975 (“the AMLA”).
 
 See Mock v. Allen,
 
 783 So.2d 828, 832 (Ala.2000) (“The AMLA applies ‘[i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care.’ ” (quoting § 6-5-548(a), Ala.Code 1975)). “To prevail on a medical-malpractice claim, a plaintiff must prove ‘ “1) the appropriate standard of care, 2) the doctor’s deviation from that standard, and 3) a proximate causal connection between the doctor’s act or omission constituting the breach and the injury sustained by the plaintiff.” ’ ”
 
 Giles v. Brookwood Health Servbs., Inc.,
 
 5 So.3d 533, 549 (Ala.2008) (quoting
 
 Pruitt v. Zeig
 
 
 *648
 

 er,
 
 590 So.2d 236, 238 (Ala.1991), quoting in turn
 
 Bradford v. McGee,
 
 534 So.2d 1076, 1079 (Ala.1988)). Although a delay in medical treatment may, in an appropriate case, constitute a breach of the standard of care as a matter of law, it does not, in and of itself, constitute an injury.
 
 See McAfee ex rel. McAfee v. Family Med., P.C.,
 
 641 So.2d 265 (Ala.1994) (holding that, absent proof of actual injury caused by alleged delay in the diagnosis and treatment of disease, plaintiffs could not recover on their AMLA claims against medical-service providers). Rather, to prevail on a medical-malpractice claim based on a delay in providing medical treatment, the plaintiff must prove that a breach of the standard of care,
 
 i.e.,
 
 the delay in treatment,
 
 proximately
 
 and
 
 probably
 
 caused actual injury to the plaintiff.
 
 See McAfee,
 
 641 So.2d at 267 (“In medical malpractice cases, the plaintiff must prove that the alleged negligence ‘probably caused the injury.’ Parr
 
 ish v. Russell,
 
 569 So.2d 328, 330 (Ala.1990), citing
 
 Williams v. Bhoopathi,
 
 474 So.2d 690, 691 (Ala.1985). This has been the standard in Alabama for decades.”).
 

 Dr. Crutcher argues that the trial court erred in denying his motion for a judgment as a matter of law on Williams’s medical-negligence claim against him because, he says, the evidence at trial did not demonstrate a probability that the alleged breach of the standard of care by him proximately caused any injury to Williams. Williams, however, argues that, by not treating her or making arrangements for her transportation to UAB hospital by emergency medical vehicle, and by not contacting UAB hospital with information on her condition, Dr. Crutcher negligently caused a delay in Williams’s treatment at UAB hospital. According to Williams, had Dr. Crutcher properly transferred her and forwarded her MRI results to UAB hospital, the neurologist at UAB hospital would have seen her when she arrived, the pressure on her brain would have been monitored upon her arrival late Friday evening, and she would have been treated for hydrocephalus before Monday, June 29, 1998. Instead, Williams argues, as a result of this alleged delay in treatment, she endured extended pain and suffering from her underlying medical condition over the weekend of June 27-28, 1998, until she finally was admitted to the neuro-intensive-care unit on Monday, June 29, 1998. Williams further argues that this delay in treatment has caused her continuing emotional distress.
 

 Our careful examination of the record reveals no evidence indicating that, once Williams arrived at UAB hospital, Williams’s treatment, or the outcome of her treatment, was in any way affected by any action Dr. Crutcher took or failed to take. Conjecture by an expert witness that Williams
 
 might
 
 have received treatment for her hydrocephalus sooner had Dr. Crutcher treated Williams for that condition at Hill Hospital and arranged for her transport to UAB hospital is not sufficient to establish that she
 
 probably
 
 would have received treatment for hydrocephalus sooner. It is undisputed that Williams would not have been relieved of her pain before the ventricular shunt was installed. Dr. Hadley’s testimony that he would have or might have
 
 admitted Williams to the hospital
 
 for monitoring early on Saturday, June 27, 1998, if he had seen a copy of the MRI report at that time, does not, without more, indicate a probability that Dr. Had-ley would have
 
 performed the surgery
 
 to install the ventricular shunt any earlier than Tuesday, June 30.
 
 See McAfee,
 
 641 So.2d at 267 (“ ‘The proof must go further than merely show that an injury could have occurred in an alleged way — it must warrant the reasonable inference and conclusion that it did so occur as alleged ....’” (quoting
 
 McKinnon v. Polk,
 
 219
 
 *649
 
 Ala. 167, 168, 121 So. 539, 540 (1929))). Because the record does not contain substantial evidence indicating that Dr. Crutcher proximately and probably injured Williams by causing a delay in her medical treatment upon her arrival at UAB hospital, we conclude that the evidence was not sufficient to warrant a jury determination on Williams’s claim for damages resulting from delayed treatment at UAB hospital.
 

 In addition to her allegation that Dr. Crutcher’s actions caused a delay in her treatment after she arrived at UAB hospital, Williams also argues that the evidence of acute fear and anxiety she suffered in the car on the way to Birmingham was sufficient to support her claim of emotional distress. She argues that she presented evidence sufficient to reasonably support the conclusion that Dr. Crutcher breached a duty not to place her at risk of foreseeable physical injury by failing to arrange for emergency transport so that, if complications, which Williams says were foreseeable, occurred during transport, medical personnel could address those complications immediately to avert permanent damage to Williams’s brain or death. Further, Williams argues that substantial evidence reasonably supports the conclusion that, while
 
 en route
 
 to UAB hospital, she in fact suffered emotional anguish and distress from complications such as severe pain and difficulty breathing while no medical personnel were available. Specifically, she was afraid that she would die or suffer physical injury because no medical personnel were available to monitor or address her symptoms until she arrived at UAB hospital. She also alleges that she continues to be distressed and fearful that she will die or suffer injury if she suffers another bout of hydrocephalus when medical personnel are not present to assist her.
 

 Dr. Crutcher argues that Williams’s alleged emotional distress resulting from not being transported to Birmingham by emergency vehicle is not a sufficient basis for the recovery of damages. In response, Williams points out that this Court has long recognized that mental or emotional harm, such as fear or anxiety, constitutes a compensable injury when the plaintiff is placed in immediate risk of reasonably foreseeable physical harm by the negligent conduct of another, regardless of whether the plaintiff also suffers a physical injury as a result of that conduct.
 
 AALAR v. Francis,
 
 716 So.2d 1141, 1145-47 (Ala.1998);
 
 Taylor v. Baptist Med. Ctr., Inc.,
 
 400 So.2d 369 (Ala.1981);
 
 see also Flagstar Enters., Inc. v. Davis,
 
 709 So.2d 1132, 1141 n. 5 (Ala.1997) (noting that “[d]amages for emotional distress may be awarded in a negligence case, even in the absence of physical injury,” when the emotional distress results from the breach of a duty not to place another in danger of physical harm);
 
 cf.
 
 § 6-5-544, Ala.Code 1975 (“In any action for injury whether in contract or in tort against a health care provider based on a breach of the standard of care, the injured plaintiff ... upon proper proof may be entitled to recover noneconomic losses to compensate for pain, suffering, ... and other nonpecuniary damage.”).
 

 In
 
 Taylor, supra,
 
 a mother sued her obstetrician, alleging that the obstetrician had breached the standard of care and had placed her at risk of physical harm by not assisting the mother in the labor and delivery of her child. 400 So.2d at 371. The obstetrician was notified at 3:00 a.m. that the mother was in labor, and he told the nurses at the hospital that he would be “right on over.”
 
 Id.
 
 However, the obstetrician did not arrive at the hospital to assist with the birth of the child until 11:40 a.m., 10 minutes after the mother delivered a child who was stillborn or who died within moments of birth. The uncontro-
 
 *650
 
 verted medical testimony established that, had the obstetrician been present during the delivery, he could have done nothing to prevent the death of the child. The mother made no claim asserting the wrongful death of her child, and she did not allege that she had been physically injured in any way by the obstetrician’s failure to attend to the delivery until after the child had been stillborn. Rather, the only injury for which the mother sought compensation was the great pain and physical anguish she suffered in delivering the child without the assistance of a physician. 400 So.2d at 371-72. The trial court entered a summary judgment for the obstetrician after finding that the mother failed to offer any evidence of a compensable injury. 400 So.2d at 371. This Court reversed the judgment, holding that, “to require physical injury caused by culpable tortious conduct, when mental suffering may be equally recognizable standing alone, would be an adherence to procrustean principles which have little or no resemblance to medical realities.” 400 So.2d at 374.
 

 However, in a variety of tort cases, this Court has held that mere fear of a future injury or disease, without more, does not constitute a compensable mental or emotional injury.
 
 See Houston Health Care Auth. v. Williams,
 
 961 So.2d 795, 810-12 (Ala.2006) (holding, in a case arising under the AMLA, that alleged emotional distress consisting “simply” of fear of possible future infection from known exposure to fungus in a contaminated breast implant, without more, did not constitute a compen-sable legal injury);
 
 Southern Bakeries, Inc. v. Knipp,
 
 852 So.2d 712, 717-18 (Ala.2002) (holding, in an action alleging fraud and failure to warn of the presence of asbestos, that mere fear that exposure to asbestos could lead to asbestos-related disease, without more, did not constitute a compensable injury; this Court noted that the plaintiff “ha[d] not sought any medical care for his alleged emotional distress and he did not plan to have any psychiatric or psychological treatment or any counseling for emotional distress or mental anguish”); and
 
 Pfizer, Inc. v. Farsian,
 
 682 So.2d 405, 407 (Ala.1996) (holding, in a product-Iiability/personal-injury action against a heart-valve manufacturer, that the plaintiffs alleged emotional distress consisting merely of the fear that his artificial heart valve, which was working properly, could one day malfunction, “is not, without more, a legal injury sufficient to support [the plaintiffs] claim”). “It is a basic principle of tort law that in negligence cases, the plaintiff must suffer actual injury; mere threat of future harm, not yet realized, is not enough.”
 
 Southern Bakeries,
 
 852 So.2d at 716 n. 7 (citing W. Page Keeton et al.,
 
 The Law of Torts
 
 § 30 at 165 (5th ed.1984)).
 

 Given every factual inference taken from this record that can reasonably be drawn in Williams’s favor and when the evidence is viewed in the light most favorable to her, the evidence in this case of Williams’s mental anguish and emotional distress caused by Dr. Crutcher’s alleged failure to arrange emergency transportation for Williams to UAB hospital indicates, at most, no more than a fear of future injury. It can reasonably be inferred from this record that, while
 
 en route
 
 to UAB hospital, without emergency personnel to assist her, Williams was afraid that she could die or suffer permanent physical damage from complications. Further, the only evidence of continuing emotional distress resulting from the fact that Williams was not transported to UAB hospital by an emergency vehicle is evidence indicating that Williams “will fear for the rest of [her] life, that [she] will get sick again and not be so lucky.” The evidence is undisputed that Williams suffered no physical injury due to the lack of emergency transportation and that emergency medical personnel would
 
 *651
 
 not have administered any medication to reduce Williams’s pain and suffering during transport. Moreover, as in
 
 Southern Bakeries, supra,
 
 Williams makes no allegation that she has had to seek medical care, psychological treatment, or counseling for her alleged emotional distress and mental anguish.
 
 See
 
 852 So.2d at 717-18. Thus,
 
 at most,
 
 the evidence of Williams’s alleged emotional distress indicates mere fear of future injury that was not and has not been realized; such evidence cannot reasonably support the conclusion that Williams suffered a legally compensable mental or emotional injury as a result of Dr. Crutcher’s alleged failure to arrange emergency medical transportation for her. “We do not denigrate” Williams’s fear of potential injury; “[w]e simply recognize that under existing precedent, that fear does not constitute a present legal injury and is not actionable, when no other present injury can be demonstrated.”
 
 Houston Health Care Auth.,
 
 961 So.2d at 811.
 

 Williams also argues that Dr. Hadley’s testimony provides substantial evidence indicating that, if Dr. Hadley had seen Williams’s MRI results when Dr. Eh-rensing consulted him early on Saturday, June 27, Dr. Hadley would have immediately admitted Williams to the neuro-inten-sive-care unit to monitor the pressure on her brain. Instead, according to Williams, because Dr. Crutcher did not provide UAB hospital with a copy of Williams’s MRI report, Dr. Hadley did not see the MRI results or admit Williams to the neuro-intensive-care unit for monitoring until Monday, June 29. Williams argues that she was, therefore, forced to wait out the weekend, suffering from hydrocephalus, in her home rather than in the hospital. As a result, she says, she suffered great fear and anxiety that she would die or incur grave injury because medical personnel were not present to monitor her condition and intervene if necessary. It is undisputed that these fears were never realized. It is undisputed that, had Williams been in the hospital for monitoring over the weekend, she would have been given no pain medication. Other than the aforementioned evidence indicating that, over the weekend, Williams simply experienced fear and distress that she might suffer an injury, the record contains no evidence indicating that Williams suffered any physical, mental, or emotional injury because she spent the weekend at home rather than in the hospital. As we have explained, evidence that Williams was afraid that injury could result, without more, is not evidence of an actual, legally compensable injury.
 
 See Southern Bakeries,
 
 852 So.2d at 716 n. 7 (stating that, in negligence cases, absent actual injury to the plaintiff, mere “threat of future harm, not yet realized, is not enough” to constitute a compensable injury).
 

 Williams argues that, under
 
 Therrell v. Fonde,
 
 495 So.2d 1046 (Ala.1986), she produced sufficient evidence to preclude a judgment as a matter of law on her claims alleging pain and suffering as a result of allegedly delayed medical treatment at UAB hospital and Dr. Crutcher’s failure to arrange emergency medical transportation for her. In
 
 Therrell,
 
 a worker sued his employer’s medical-service providers for allegedly failing to treat him or to arrange emergency medical transportation for him after his hand was crushed in an industrial accident. 495 So.2d at 1047-48. The worker alleged that, as a result, he was forced to wait approximately one or two hours before receiving medical treatment. 495 So.2d at 1047. The worker ultimately underwent extensive surgery on his hand; his left middle finger was amputated, and steel pins were put in another finger. At the time he filed his action, the worker had not regained full use of two of his fingers.
 
 Id.
 
 In reversing a summary judgment for the medical-service providers, this Court held:
 

 
 *652
 
 “Given [the worker’s and co-employee’s] testimony that [the company nurse] refused to allow speedier transportation and that [the company doctor] did nothing to prevent this delay and did not even look at [the worker’s] hand, the record in this case presents
 
 sufficient evidence to withstand a motion for summary judgment. ...
 
 Although the doctors who treated [the worker’s] hand gave affidavits that the loss was determined by the initial accident [and there was no other expert medical testimony], it appears that [the worker] could show the injury of extended pain and suffering from the asserted indifferent treatment and unnecessary delay. Because [the worker] has produced
 
 at least a scintilla
 
 of evidence of breach of the standard of care and of injury proximately resulting therefrom, the trial court erred in
 
 granting summary judgment
 
 for these defendants.”
 

 495 So.2d at 1048 (emphasis added).
 

 Thus, in
 
 Therrell,
 
 we held that the summary judgment was improper because the worker had presented a “scintilla” of evidence of an actual injury, which at that time was all that was required of a non-movant to overcome a motion for a summary judgment.
 
 See Drill Parts & Serv. Co. v. Joy Mfg. Co.,
 
 619 So.2d 1280, 1282 (Ala.1993) (recognizing that, in cases filed on or before June 11, 1987, the scintilla rule of evidence provided the applicable standard for determining whether summary judgment was warranted); § 12-21-12, Ala.Code 1975 (abolishing the scintilla rule in favor of the substantial-evidence rule). To defeat a motion for a judgment as a matter of law, the “nonmovant must have presented
 
 substantial
 
 evidence.”
 
 Waddell & Reed, Inc.,
 
 875 So.2d at 1152 (emphasis added) (citing § 12-21-12, Ala. Code 1975;
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989)). Williams has not come forward with
 
 substantial
 
 evidence of
 
 actual
 
 injury to overcome Dr. Crutcher’s motion for a judgment as a matter of law. Moreover,
 
 Therrell
 
 does not suggest that the “scintilla” of evidence the worker produced was evidence of a mere possibility of injury or of a mere fear of injury, without more, as is true of the evidence upon which Williams relies in this case. Thus,
 
 Ther-rell
 
 does not support Williams’s
 
 argument
 
 that her case ought to have been submitted to a jury.
 

 Conclusion
 

 In conclusion, this record does not contain substantial evidence indicating that any alleged breach of the standard of care by Dr. Crutcher proximately caused Williams any legally cognizable injury. Therefore, Dr. Crutcher was entitled to a judgment as a matter of law on Williams’s medical-negligence claim. Accordingly, we reverse the judgment of the trial court on Williams’s medical-negligence claim against Dr. Crutcher and render judgment in favor of Dr. Crutcher.
 

 REVERSED AND JUDGMENT RENDERED.
 

 SEE, WOODALL, SMITH, and PARKER, JJ., concur.
 

 [1]
 

 . In its entirety, the trial court's order states:
 

 "Pursuant to the Jury Verdict of October 11, 2005, judgment is rendered in favor of the Plaintiff Iola Williams and against the Defendants Colie E. Crutcher, Jr., M.D., and City of York Healthcare Authority/Hill Hospital in the amount of One Hundred Forty-five Thousand Dollars ($145,000) for compensatory damages.
 

 "Costs are taxed to the Defendants Colie E. Crutcher, Jr., M.D. and City of York Healthcare Authority/Hill Hospital.”
 

 [2]
 

 . The notice of appeal in this case was filed on March 7, 2006; Dr. Crutcher's appellant's brief was not filed until August 9, 2007, due in large part to the failure of the circuit clerk to timely file the record on appeal. Among the arguments he asserts in his brief on the merits is that "the judgment in this case may not be a final judgment.”
 

 [3]
 

 . Although normally the party arguing in favor of jurisdiction is the appellant, in this case that party is Williams, the appellee. The party invoking the Court's subject-matter jurisdiction bears the burden of establishing a basis for that jurisdiction. See, e.g.,
 
 Ex parte HealthSouth Corp.,
 
 supra;
 
 Ex parte Haynes Downard Andra & Jones, LLP,
 
 supra;
 
 Ex parte Ray-El,
 
 supra; and
 
 Bush v. Laggo Props., L.L.C.,
 
 supra.
 

 [1]
 

 . The trial court’s judgment in favor of Iola Williams on her claims against Dr. Crutcher became final upon the trial court’s June 27, 2008, order disposing of a cross-claim against Dr. Crutcher.
 

 [2]
 

 . The relationship between Dr. Quarles and Dr. Crutcher is unclear. Dr. Crutcher did have a family practice and was covering for Dr. Quarles on the day Williams had the MRI. He also served as an emergency-room physician at Hill Hospital.
 

 [3]
 

 . Dr. Crutcher testified that Williams refused treatment; Williams’s testimony, however, was to the contrary.