BROOKWOOD HEALTH SERVICES, INC., d/b/a Brookwood Medical Center

v.

Wilfred BORDEN and Pam Borden.

1131284.

Supreme Court of Alabama.

Nov. 13, 2015.

Rehearing Denied April 22, 2016.

Richard H. Gill of Copeland, Franco, Screws & Gill, P.A., Montgomery; and Thomas A. Kendrick, Holly S. Bell, and W.M. Bains Fleming III of Norman, Wood, Kendrick & Turner, Birmingham, for appellant.

S. Shay Samples, Bruce J. McKee, and Ashley Reitz Peinhardt of Hare, Wynn, Newell & Newton, LLP, Birmingham, for appellees.

WISE, Justice.

The remaining defendant below, Brookwood Health Services, Inc., d/b/a Brookwood Medical Center ("Brookwood"), appeals from a judgment in favor of the plaintiffs, Wilfred Borden and Pam Borden. We reverse and render a judgment for Brookwood.

### Facts and Procedural History

On September 8, 2010, Dr. Thomas A. Staner, a board-certified neurosurgeon and neurologist, performed a lumbar laminectomy on Wilfred at Brookwood Medical Center. Wilfred was released from the hospital on Friday, September 10, 2010. On the evening of Saturday, September 11, 2010, Wilfred was at home lying in bed. According to Wilfred, when he rolled over and sat up on the side of the bed, he suddenly had excruciating pain up and down his lower back and legs; his legs felt like they were on fire; and his feet felt like somebody was sticking him with pins and needles. Wilfred called for his wife, Pam. Pam and his daughters went to the bedroom. After he told Pam what was going on, he asked her to massage his legs. Although Pam and his daughters were massaging Wilfred's legs, he could not feel it.

Pam telephoned Dr. Staner around 7:30 p.m. After she and Wilfred had both talked to him, Dr. Staner told them that Wilfred needed to get to the Brookwood Medical Center emergency room ("ER") right away. Pam called an ambulance because Wilfred could not feel his weight on his feet and did not trust that he could stand up. An ambulance arrived and took Wilfred to the ER, and Pam drove to the ER in her vehicle.

Dr. Ricky Phillips saw Wilfred in the ER, and he consulted with Dr. Staner by telephone. In his notes, Dr. Phillips indicated that he saw Wilfred at 9:10 p.m.; that Wilfred had lost sensation, primarily in his left foot; that Wilfred was not able to "wiggle" his ankles; that Wilfred said he could not wiggle his toes; and that sensation was nearly absent in Wilfred's feet. However, his notes indicated that Wilfred was able to lift both legs off the gurney individually; that Wilfred was continent; and that Wilfred's distal pulses were normal. Dr. Staner testified that Dr. Phillips told him that Wilfred was able to lift both of his legs off the gurney and that Wilfred was continent.

A CT scan was performed on Wilfred. Dr. Greg Jackson, a radiologist, reviewed the CT scan, and Dr. Staner reviewed it from home as well. Dr. Phillips's notes indicated that the CT scan "show[ed] a small hematoma, but no obvious acute change." Dr. Phillips discussed Wilfred with Dr. Staner, and they decided upon the following plan: "[B]ed the patient down, pain medication and Dr. Staner will take over management of the patient." Dr. Phillips entered the admission orders for Wilfred, which called for a neurovascular check every two hours. Additionally, the orders provided: "CALL ADMITTING PHYSICIAN FOR ANY QUESTIONS, PROBLEMS, CHANGE OF STATUS OR FOR FURTHER ORDERS." (Capitalization in original.)

Wilfred was subsequently admitted to 4 Main, which is an orthopedic floor at Brookwood Medical Center. Tonya Tolbert, a registered nurse who worked on 4 Main, received Wilfred around midnight. Around 12:15 a.m., Tolbert performed an initial baseline assessment on Wilfred and a neurovascular check. When Wilfred arrived on the floor, he was wet, and the nursing notes Tolbert prepared after Wilfred arrived indicate that he was incontinent. Tolbert's notes also indicate that Wilfred could not move his legs and that his pedal pulses, i.e., the pulses on his feet, were weak or faint.

At 7:00 a.m. on September 12, 2010, Amy Jeffers, a registered nurse who worked for Brookwood at that time, started her shift on 4 Main. When she came on shift, she received a detailed report from Tolbert regarding her patients, including Wilfred. She testified that, according to the doctor's admission orders, she performed a neurovascular check on Wilfred every two hours.

At 10:00 a.m. on September 12, 2010, Dr. Staner came to the hospital and saw Wilfred. Dr. Staner testified that, when he saw Wilfred, Wilfred had a lot of pain in his back and legs but that the pain might have been some better than earlier. Dr. Staner asked Wilfred to move his legs, but Wilfred said that he could not. When Dr. Staner assisted Wilfred in moving his legs, Wilfred barely moved his legs an inch under great pain and effort. Dr. Staner testified that that was a big difference from the night before when Dr. Phillips indicated that Wilfred had moved his legs in the ER. Dr. Staner later found out that Wilfred had become incontinent of urine and stool, which also was a major change from his condition when Dr. Staner had talked to Dr. Phillips. Dr. Staner testified that no nurse at Brookwood Medical Center had telephoned him and notified him that Wilfred had lost the ability to move his legs and had become incontinent.

Subsequently, Dr. Staner ordered a myelogram CT. In the myelogram, he saw a hematoma or blood clot that was causing compression of the cauda equina, a collection of nerves that travel through the spine and then exit the spinal canal at different levels. Virtually all the nerves that go into the legs, bladder, rectum, and genital areas are contained within the cauda equina. At 2:00 p.m., Dr. Staner performed another surgery to evacuate the hematoma. He testified that, if he had been notified of Wilfred's condition at 12:15 a.m., when Wilfred was received on 4 Main, he would have come to the hospital at that time and ordered the myelogram CT, and, if the results of the myelogram warranted, he would have performed surgery on Wilfred between 4:00 a.m. and 5:00 a.m.

Wilfred suffered damage to the cauda equina as the result of the compression caused by the hematoma. Dr. Saran Rosner, a board-certified neurologist, testified that cauda equina syndrome is where there is a common path of pain, weakness,

and numbness of the nerves that goes into the legs. There can be various causes for cauda equina syndrome, including a hematoma resulting from surgery. Dr. Rosner testified that Wilfred suffered a postoperative complication after the lumbar laminectomy of the lower back, which was a hematoma or blood clot that was squeezing or compressing the cauda equina. As a consequence of that complication, Wilfred developed cauda equina syndrome. Dr. Rosner testified that, in his opinion, Wilfred had significant and substantial cauda equina syndrome. He stated:

> "Well, his manifestations of the cauda equina syndrome were basically virtually a full-blown picture of what can happen if the cauda equina gets compressed. In other words, those nerves are under pressure and they stop working. So we had weakness, first in his ankles, moving his feet either up or down or side to side. Couldn't move them in any direction. Later, he developed more nerves being affected by the pressure of the clot. He had difficulty or inability to lift his legs. He had numbness in his legs. He also had terrible pain down his legs. When you start squashing those nerves with a big blood clot, it causes pain, causes very severe pain. You can imagine if someone pressed on a raw nerve or a whole bunch of raw nerves, it's going to cause some very substantial pain. He had pain. He has weakness. He has numbness and also had some impairment of his ability to urinate normally and control his bladder function."

Dr. Rosner testified that, in Wilfred, who had a postoperative symptomatic epidural hematoma, cauda equina syndrome presented a neurosurgical emergency. He also testified that surgical timing is a critical factor with regard to the type of hematoma Wilfred suffered.

Dr. Rosner discussed articles that dealt with the fact that patients with cauda equina syndrome caused by a hematoma who had surgery within 12 hours of the onset of symptoms had a better outcome than patients who did not have surgery within the first 12 hours. During the Bordens' direct examination of Dr. Rosner, the following occurred:

> "[COUNSEL FOR THE BORDENS:] ... Dr. Rosner, I want you to assume that Dr. Staner had been able to perform surgery, like he's testified under oath he would have done somewhere between 4 and 5 p.m. [sic]. And consistent with what he testified to yesterday in front of these ladies and gentlemen of the jury. Do you have an opinion based on reasonable medical probability, more likely than not, as to whether [Wilfred's] neurological outcome would have been substantially and significantly improved if surgery had been done between four and five o'clock?
>
> "[DR. ROSNER:] Yes, I do.
>
> "[COUNSEL FOR THE BORDENS:] Would you please tell the Court and the ladies and gentlemen of the jury what your opinion is in that regard, please.
>
> "[COUNSEL FOR THE BORDENS:] I think that if Mr. Borden underwent surgery during this time period within the first twelve hours, less than twelve hours of the symptoms, that he would have enjoyed a better operative result.
>
> "[COUNSEL FOR THE BORDENS:] And do you believe that his neurological outcome would have been substantially and significantly improved probably?
>
> "[DR. ROSNER:] Yes, I do.
>
> " . . . .
>
> "[COUNSEL FOR THE BORDENS:] So if Dr. Staner, he would have been able to be within that twelve-hour window if the surgery had been done between four and five; right?

"[DR. ROSNER:] Yes, sir.

"[COUNSEL FOR THE BORDENS:] And that would have stopped the compression that was occurring on his cauda equina nine-and-a-half or ten hours earlier than what it ended up being?

"[DR. ROSNER:] That's correct.

"[COUNSEL FOR THE BORDENS:] So did the additional nine-and-a-half or ten hours of that compression, that squeezing of the cauda equina, probably cause [Wilfred] Borden harm neurologically?

"[DR. ROSNER:] Yes. He was rapidly deteriorating. He wasn't a stable patient. He came in with a certain deficit and remained stable over 12 hours, 14 hours. He progressed not only quickly from nine o'clock, when some of his exams are documented, until twelve o'clock, when he has a very dramatically different examination. So over just two or three hours, he's really slid downhill.

"Then with that increased pressure, increased neurological deficit, increased compromise, it stays there untreated for another 14 hours from 12:30 in the morning until 2 p.m. in the afternoon. So 14 hours go by on a man who is rapidly deteriorating. You have to believe that if you take that clot out and arrest this deterioration, this sliding down the slope, if you get the clot out, get the pressure off the nerves expeditiously, that he's going to enjoy a better outcome. That extra 14 hours of sitting with the clot sitting on the nerves neither reasonably or by common sense but also medically just doesn't make sense.

"[COUNSEL FOR THE BORDENS:] And did that additional time probably materially and adversely affect his outcome, in your opinion?

"[DR. ROSNER:] Yes.

"[COUNSEL FOR THE BORDENS:] Meaning that his outcome would have been substantially and significantly better if the surgery had been done within the twelve-hour window of time?

"[DR. ROSNER:] Yes."

Dr. Rosner testified that he believed that Dr. Staner's care had fallen below the standard of care of a neurosurgeon when he did not initially come to the hospital after talking to the Bordens at 7:30 p.m. He also testified that, in his opinion, the initial CT scan that was done on September 11, 2010, showed compression of the thecal sac, which surrounds the cauda equina.

After his surgery on September 12, 2010, Wilfred remained hospitalized until he was admitted to rehabilitation at Brookwood Medical Center. He was discharged from rehabilitation on October 1, 2010. After he was discharged and returned home, he went to some rehabilitation appointments at St. Vincent's East. As a result of the damage caused by the hematoma, Wilfred is permanently disabled and unable to work, suffers from constant pain, has problems walking, and suffers from incontinence of bladder and bowel and from impotence.

On September 7, 2012, Wilfred and Pam sued Dr. Staner, Alabama Neurosurgeons, P.C., Dr. Staner's practice, and Brookwood in the Jefferson Circuit Court. Wilfred asserted a claim under the Alabama Medical Liability Act against the defendants, and Pam asserted a claim based on loss of consortium. Brookwood filed a motion for a summary judgment. On February 19, 2014, the trial court entered an order granting Brookwood's summary-judgment motion as to any claim alleging a duty and breach of the standard of care on the part of Brookwood's ER department. However, it denied the motion for a summary judgment as to the Bordens' claims against Brookwood based an alleged breach of the

standard of care by Brookwood's medical/surgical nurses.

The case went to trial on the Bordens' claims against Brookwood, Dr. Staner, and Alabama Neurosurgeons. However, during the trial, the Bordens dismissed their claims against Staner and Alabama Neurosurgeons, with prejudice. The trial continued with Brookwood as the sole remaining defendant.

At the close of the Bordens' evidence, Brookwood moved for a judgment as a matter of law. The trial court granted the motion as to the issue of future medical expenses but denied it as to the Bordens' remaining claims. Brookwood renewed its motion for a judgment as a matter of law at the close of all the evidence, and the trial court denied that motion. After deliberating for approximately six hours, the jury returned a verdict in favor of Wilfred as to his medical-malpractice claim and fixed damages at $5 million. It also found in favor of Pam as to her loss-of-consortium claim and fixed damages at $2.5 million. The trial court entered a judgment on the jury's verdict.

On March 28, 2014, Brookwood filed a "Defendant's Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial, or in the Alternative, Motion for Remittitur." After the Bordens filed their response, the trial court conducted a hearing on Brookwood's postjudgment motion. Thereafter, it entered a detailed order denying the motion, which it subsequently amended on June 24, 2014. Brookwood appealed.

### Standard of Review

■ " 'When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion.... *Palm Harbor Homes, Inc. v. Crawford*, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. *Carter v. Henderson*, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12–21–12, Ala. Code 1975; *West v. Founders Life Assurance Co. of Fla.*, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. *Carter*, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. *Id.* Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. *Ricwil, Inc. v. S.L. Pappas & Co.*, 599 So.2d 1126 (Ala.1992).'

"*Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So.2d 1143, 1152 (Ala.2003)."

*Crutcher v. Williams*, 12 So.3d 631, 641–42 (Ala.2008).

### Discussion

■ Brookwood argues that the trial court erred in denying its preverdict motions for a judgment as a matter of law and its postjudgment motion. Specifically, it contends that the Bordens did not present sufficient evidence to support their claims under the Alabama Medical Liability Act because the Bordens did not present expert testimony to establish that the

nurses on 4 Main had breached the applicable standard of care.

"To maintain a medical-malpractice action, the plaintiff ordinarily must present expert testimony from a 'similarly situated health-care provider' as to (1) 'the appropriate standard of care,' (2) a 'deviation from that standard [of care],' and (3) 'a proximate causal connection between the [defendant's] act or omission constituting the breach and the injury sustained by the plaintiff.' *Pruitt v. Zeiger,* 590 So.2d 236, 238 (Ala.1991) (quoting *Bradford v. McGee,* 534 So.2d 1076, 1079 (Ala.1988)). The reason for the rule that proximate causation must be established through expert testimony is that the issue of causation in a medical-malpractice case is ordinarily 'beyond "the ken of the average layman." ' *Golden v. Stein,* 670 So.2d 904, 907 (Ala. 1995), quoting Charles W. Gamble, *McElroy's Alabama Evidence,* § 127.01(5)(c), p. 333 (4th ed.1991). The plaintiff must prove through expert testimony 'that the alleged negligence "probably caused the injury." ' *McAfee v. Baptist Med. Ctr.,* 641 So.2d 265, 267 (Ala.1994)."

*Lyons v. Walker Reg'l Med. Ctr.,* 791 So.2d 937, 942 (Ala.2000).

" 'However, "[a]n exception to this rule [requiring expert testimony] exists 'in a case where want of skill or lack of care is so apparent ... as to be understood by a layman, and requires only common knowledge and experience to understand it.' " [*Tuscaloosa Orthopedic Appliance Co. v.] Wyatt,* 460 So.2d [156,] 161 [ (Ala. 1984) ] (quoting *Dimoff v. Maitre,* 432 So.2d 1225, 1226–27 (Ala.1983)). This Court has recognized the following situations as falling within this exception:

" ' " " '1) where a foreign instrumentality is found in the plaintiff's body following surgery; 2) where the injury complained of is in no way connected to the condition for which the plaintiff sought treatment; 3) where the plaintiff employs a recognized standard or authoritative medical text or treatise to prove what is or is not proper practice; and 4) where the plaintiff is himself or herself a medical expert qualified to evaluate the doctor's allegedly negligent conduct.' "

" ' *Allred [v. Shirley ],* 598 So.2d [1347,] 1350 [ (Ala.1992) ] (quoting *Holt v. Godsil,* 447 So.2d 191, 192–93 (Ala.1984) (citations omitted in *Allred* )).'

"*Anderson v. Alabama Reference Labs.,* 778 So.2d 806, 811 (Ala.2000); see also *Sorrell v. King,* 946 So.2d [854,] 861–62 [ (Ala.2006) ]; *Ex parte HealthSouth Corp.,* 851 So.2d 33, 37 (Ala.2002)."

*Cobb v. Fisher,* 20 So.3d 1253, 1257–58 (Ala.2009).

In this case, the Bordens did not present any expert testimony indicating that Tolbert or Jeffers breached the applicable standard of care. The only testimony as to the standard of care came from Tolbert and Jeffers. Both Tolbert and Jeffers testified that the standard of care required them to comply with the doctor's orders and to notify Dr. Staner if there was any change in Wilfred's condition. Tolbert and Jeffers repeatedly testified that the standard of care for a registered nurse at Brookwood Medical Center would require a nurse to notify the doctor of Wilfred's inability to move his legs and incontinence if that had been a change in his condition. Tolbert agreed that, based on the ER records, there had been changes in Wilfred's condition from the time he was admitted to the ER until she received him as a patient

on 4 Main. However, she testified that, before she received Wilfred, she received a telephone call from an ER nurse regarding Wilfred. Tolbert testified that the ER nurse told her that Wilfred was a two-day postoperative patient who had had back surgery; that he was incontinent; that he was going to be on 23–hour observation; that he would have nothing by mouth, as he was going to have surgery; that he could not move his legs; and that he arrived at the ER complaining that he could not move his legs. Tolbert testified that she did not document the call from the ER nurse in her notes. Tolbert testified that her findings in her initial assessment of Wilfred and the neurovascular assessment she performed at 12:15 a.m. were consistent with the oral report she had received from the ER. She further testified that, consistent with the oral report she had received from the ER, there was no change in Wilfred's condition from the time she received him on 4 Main until her shift ended.

During Brookwood's cross-examination of Tolbert, the following occurred:

"[COUNSEL FOR BROOKWOOD:] When you were providing nursing care to Mr. Borden ... did you do your best to provide that type of nursing care that you like to provide to patients?

"[TOLBERT:] Yes, I did.

"[COUNSEL FOR BROOKWOOD:] And did you follow the orders that were in place for Mr. Borden?

"[TOLBERT:] Yes, I did.

"[COUNSEL FOR BROOKWOOD:] Did you try to do everything that you were supposed to do when you received him as a patient?

"[TOLBERT:] Yes."

She testified that the standard of care required her to follow orders written by the physicians and that she did that in this case. Later, in the cross-examination, the following occurred:

"[COUNSEL FOR BROOKWOOD:] And if a nurse calls you and tells you that you have a patient coming who is incontinent of urine, they're having difficulty moving, decreased sensation, you don't need to review the record to check out that information, do you?

"[TOLBERT:] No, I do not. I need to ask the patient that's coming up, do you know what's going on with them.

"[COUNSEL FOR BROOKWOOD:] And can you rely upon those verbal reports that you get from the other nurses?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] And on this night, when you received Mr. Borden, did you find him to be exactly the way he was told to you that he would be when you talked to the emergency room?

"[TOLBERT:] Yes."

Tolbert testified that she knew that Dr. Staner was the physician responsible for Wilfred. She also testified that, if she had any questions, concerns, or anything to be reported, she would contact Dr. Staner and that, if she had seen any changes in Wilfred's condition, she would have called Dr. Staner. During Brookwood's cross-examination of Tolbert, the following occurred:

"[COUNSEL FOR BROOKWOOD:] Did you know that you could call any admitting physician with any questions that you have about your patient?

"[TOLBERT:] Any time. Any time there's a problem, I can call the doctor, yes.

"[COUNSEL FOR BROOKWOOD:] And would you do that?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] Had you had a question about Mr. Borden, would you have called Dr. Staner to ask him about that?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] Was there any question that you had when you received him that you felt like you needed additional instructions?

"[TOLBERT:] No.

"[COUNSEL FOR BROOKWOOD:] Problems. Did any problems come up during the night that you felt like you needed to discuss with Dr. Staner?

"[TOLBERT:] No.

"[COUNSEL FOR BROOKWOOD:] Change of status. Now, you know the allegation in this case is that there was a change of status that you failed to notify Dr. Staner about; right?

"[TOLBERT:] Yes, in this case.

"[COUNSEL FOR BROOKWOOD:] That's the claim that [counsel for the Bordens] has made?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] Directed against your nursing care.

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] Tell the ladies and gentlemen of the jury, Ms. Tolbert, did you ever see a change of status that required a report to Dr. Staner?

"[TOLBERT:] No, I did not see any change in status to report to Dr. Staner.

"[COUNSEL FOR BROOKWOOD:] Had you observed a change of status that you felt like was in the best interest of the patient to report to Dr. Staner, would there have been any hesitation on your part to do that?

"[TOLBERT:] No. I would have called Dr. Staner if there was a change in [Wilfred's] condition.

"[COUNSEL FOR BROOKWOOD:] Is it reasonable for you, as a nurse, to expect the admitting physician to know why the patient is being admitted?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] Was it reasonable for you on the night or the early morning hours of September 12 to expect that Dr. Staner already knew about the incontinence?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] That he already knew about decreased sensation?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] That he already knew about decrease in movement?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] Did you understand or was it your understanding at the time that those were the very conditions that were leading to his admission to your floor?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] And that you were to observe the patient and see if his status changed from that baseline that you had at the time?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] And did you see any change from the baseline that you received with Mr. Borden?

"[TOLBERT:] No, I did not see any changes that was bad to report to Dr. Staner.

"[COUNSEL FOR BROOKWOOD:] Did you know how he was at 9:10 when Dr. Phillips had examined him?

"[TOLBERT:] No.

"[COUNSEL FOR BROOKWOOD:] Were you in the emergency room then?

"[TOLBERT:] No.

"[COUNSEL FOR BROOKWOOD:] Did you have any information other than what the nurses told you at the time or the nurse told you at the time when his care was transferred up to your care on your floor?

"[TOLBERT:] No.

"[COUNSEL FOR BROOKWOOD:] At least based on the report you had, were you expecting a patient that did have neurological compromise?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] And is that something that you expected the attending physician to already know about?

"[TOLBERT:] No.

"[COUNSEL FOR BROOKWOOD:] And that was the reason for his admission?

"[TOLBERT:] Yes."

Subsequently, the following occurred:

"[COUNSEL FOR BROOKWOOD:] In providing care to Mr. Borden, was there ever any change of status that you were required to report to Dr. Staner under the standard of care?

"[TOLBERT:] No.

"[COUNSEL FOR BROOKWOOD:] Did you meet your obligations to Mr. Borden?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] Did you provide that degree of care, skill and diligence generally exercised by nurses under the same circumstances?

"[TOLBERT:] Yes, sir, I did."

Tolbert also testified that the applicable standard of care did not require her to question the ER nurse who had telephoned her upon Wilfred's admission re-

garding whether Dr. Staner was aware of the condition of the patient. She further testified that, in exercising the standard of care, she was entitled to rely on information she received from other nurses at Brookwood Medical Center. Subsequently, the following occurred:

"[COUNSEL FOR BROOKWOOD:] ... And was it your thought at the time, based on the condition of Mr. Borden when he came up to your floor, that you would expect a physician to have seen him in the emergency room?

"[TOLBERT:] Yes. I knew he was seen in the emergency room. I thought he saw him.

"[COUNSEL FOR BROOKWOOD:] And know his condition?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] And enter appropriate orders on it?

"[TOLBERT:] Yes.

"[COUNSEL FOR BROOKWOOD:] And then you took that patient from that point on, and did you follow those orders to a T?

"[TOLBERT:] Yes, I did."

Additionally, Jeffers testified that, when she was working on 4 Main at Brookwood Medical Center, she received patients onto the floor who had come up from the ER. When asked if she would get a report from the ER about a patient that would be coming up to 4 Main, she responded:

"Yes. They could give us one over the phone. The ER would give us one over the phone, and then we'd write our own notes and things."

However, Jeffers testified that, under the standard of care applicable to a nurse working on 4 Main, she was not required

to record a report she received from the ER about a patient.

Subsequently, the following occurred:

"[COUNSEL FOR BROOKWOOD:] The purpose of that report is just so that you can assess the patient that's coming onto the floor; is that true?

"[JEFFERS:] Oh, yes. Definitely."

At trial, Tolbert repeatedly testified that she had complied with the applicable standard of care. Additionally, Jeffers testified that she believed that Tolbert had complied with the applicable standard of care.

In its order denying Brookwood's post-judgment motion, the trial court found that, viewing the testimony in the light most favorable to the Bordens, sufficient evidence existed from which a reasonable jury could find that both Tolbert and Jeffers had breached the standard of care. The trial court stated:

"For example, the jury could disbelieve Nurse Tolbert's testimony about having received an oral report from an emergency room nurse. Accordingly, if the jury were to disbelieve that portion of Nurse Tolbert's testimony, the only logical conclusion would be that there had been a change in Mr. Borden's condition, and failing to report such a change would have been a breach of duty."

However, the Bordens did not present any evidence to dispute Tolbert's testimony that she had received a report from the ER nurse regarding Wilfred. At trial, the Bordens' counsel pointed out that Tolbert had not documented any such report. However, both Tolbert and Jeffers testified that the standard of care applicable to nurses did not require them to document when they received a report from another nurse. Further, the nursing portion of the disposition section of the ER records includes the following notation:

"ER Admission Notification <SCB 9/11/2010 23:31>

". . . .

"Report: Report called to receiving RN <PCK 9/11/10 23:38>"

The ER records indicate that "PCK" is Penny C. Knight, a registered nurse. Therefore, the undisputed evidence before the jury established that an ER nurse had called a report to Tolbert. Further, the Bordens' own testimony established that Wilfred experienced urinary incontinence while he was in the ER and that an ER nurse was aware of that incontinence. Wilfred testified that he vividly remembered an incident in the ER when he put his hands beneath his blanket and felt that he was wet. He testified that he asked Pam to bend down, that he told Pam that he thought he was wet, and that Pam lifted the blanket and said that he was wet. Additionally, Pam testified that she remembered Wilfred leaving to get the CT scan and then coming back into the room they had been in in the ER. She was not sure if it was right before he went to the CT scan or after he had come back, but Wilfred had his hands under the covers and said that he was wet. When she lifted his sheet, he was urinating on himself, but he did not know it. Pam said she told the nurse that she would change him if the nurse would get something to change him. Pam said that, after the nurse got her some clean sheets and a gown to put on him, she changed Wilfred. Pam testified that Wilfred had another bout of incontinence before going up to 4 Main, that she told the nurse that he was wet again, and that she changed his sheets again. Pam further testified that Wilfred wet himself on the way up to 4 Main, that she did not know that he had wet himself again until they actually got to 4 Main, and that she thought that she had helped Tolbert

change Wilfred before they moved him from the gurney to the bed.

In its order denying Brookwood's post-judgment motion, the trial court stated:

"Also, based upon the seriousness of Mr. Borden's conditions, a jury could find that Nurse Tolbert and Nurse Jeffers failures to report Mr. Borden's condition to Dr. Staner, regardless of any change, was a breach of doctor's orders which required a nurse to report any questions or problems as well as a breach of the document in the nurses' notes requiring notification of a neurovascular compromise."

However, there was no expert testimony that would support such a finding by the jury. Tolbert testified that there were no problems during her shift that would have required her to telephone Dr. Staner and that she had complied with the portion of Dr. Staner's orders to report any changes in condition. The Bordens' counsel questioned Tolbert about that language on the neurovascular flow sheet, and the following occurred:

"[PLAINTIFFS' COUNSEL:] Let me read the third paragraph that is highlighted. 'Notify physician of any neurovascular compromise and document notification in the nurses' notes.' Did I read that correctly? Did I read that correctly, ma'am?

"[TOLBERT:] Yes.

"[PLAINTIFFS' COUNSEL:] And that is part of the order, isn't it?

"[TOLBERT:] It's not an order. That's just on the form on the nursing notes.

"[PLAINTIFFS' COUNSEL:] Aren't you expected and required by Brookwood to follow that directive, to 'Notify the physician of any neurovascular compromise and document that notification

in the nursing notes'? Aren't you expected and required to do that?

"[TOLBERT:] *Yes. If there's any changes in my neurovascular, to notify the doctor. There was no changes.*

"[PLAINTIFFS' COUNSEL:] Nurse Tolbert, that says nothing about changes, does it?

"[TOLBERT:] No, it doesn't.

"[PLAINTIFFS' COUNSEL:] That's a very simple question. It says nothing about changes, does it?

"[TOLBERT:] He came up with compromise, so why would I notify him if he's already been compromised."

Tolbert did not testify that the standard of care would require a nurse to notify the admitting physician of any neurovascular compromise regardless of whether there had been change in the patient's condition. Further, during Brookwood's cross-examination of Jeffers, the following occurred:

"[COUNSEL FOR BROOKWOOD:] One more thing. On the neurovascular flow sheet you see right above, there's a sentence that says 'Notify physician of any neurovascular compromise and document notification in the nursing notes.' Do you see that?

"[JEFFERS:] Yes.

"[COUNSEL FOR BROOKWOOD:] As a nurse that was working at Brookwood back in 2010, do you understand that language to have been an order from a physician as to how to care for a patient?

"[JEFFERS:] Yes. I mean, it's telling you what to do.

"[COUNSEL FOR BROOKWOOD:] Well, if this is telling you what to do, can you tell me the difference between a—if he's got all these things that you have,

these are compromises in his neurovascular system; right?

"[JEFFERS:] Yes.

"[COUNSEL FOR BROOKWOOD:] If he has all of these things, and we just talked about that there were some changes that were going on in Mr. Borden, then if there's this language on the flow sheet, why, as a nurse, would you not be required under the standard of care to alert the doctor?

"[JEFFERS:] Because there was no change. He was the same from the shift before. In some cases, a little bit better, even if it was just temporary. So that, to me, indicates that, you know, he hadn't changed over the course of the night. When he came into the ER, he was the same as when I was assessing him. The ER, I would imagine, notifies the physician."

Additionally, the Bordens did not present any expert testimony to dispute Tolbert's testimony regarding the neurovascular flow sheet and did not present any expert testimony to establish that the standard of care would have required Tolbert or Jeffers to notify Dr. Staner of any neurovascular compromise even if there had not been any change in Wilfred's condition. Further, although the doctor's admission orders required a neurovascular check every two hours, the orders specified that the admitting physician should be called only if there were changes in condition, problems, or questions or for other orders.

In this case, the Bordens did not present expert testimony to establish a breach of the applicable standard of care. Additionally, this was not a case where the want of skill or lack of care was so apparent as to be understood by a layperson and required only common knowledge and experience to understand. Therefore, the trial court erred when it denied Brookwood's motions for a judgment as a matter of law as to Wilfred's medical-malpractice claim. *See Jones v. Bradford,* 623 So.2d 1112 (Ala. 1993).

*Conclusion*

Because there was no expert testimony that established that Tolbert or Jeffers breached the applicable standard of care, the trial court erred in denying Brookwood's motions for a judgment as matter of law as to Wilfred's medical-malpractice claim. Because we are reversing the judgment as to Wilfred's claim, we must also reverse the judgment entered on Pam's derivative loss-of-consortium claim. *See Delta Health Grp., Inc. v. Stafford,* 887 So.2d 887 (Ala.2004). Accordingly, we reverse the trial court's judgment and render a judgment as a matter of law in favor of Brookwood.[1]

REVERSED AND JUDGMENT RENDERED.

STUART, BOLIN, MURDOCK, SHAW, and MAIN, JJ., concur.

MOORE, C.J., and BRYAN, J., dissent.

---

1. Based on our resolution of this issue, we pretermit discussion as to the parties' remaining arguments.